IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KIM FITZPATRICK COLEMAN,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>MARLIES BURNS, et al.,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:10-cv-1186-TC |

Plaintiff Kim Coleman was previously employed as Director of the Monticello Academy (Monticello), a charter school located in West Valley City, Utah.  In January 2009, the State Charter School Board (SCSB) directed that Ms. Coleman be removed as Director, based on alleged violations of state law requirements for providing special education services. Responding to the SCSB directive, the Monticello Board of Directors placed Ms. Coleman on administrative leave and did not renew her contract.

Defendants in this case include members of the SCSB and Marlies Burns, the Director of Charter Schools for the State of Utah.  In orders dated September 28, 2011, and May 25, 2012 (ECF Nos. 32 and 52), the court dismissed other previously named defendants and several of Ms. Coleman's claims.  The only remaining claim is a claim under 42 U.S.C. § 1983, in which Ms. Coleman alleges that Defendants deprived her of property and liberty interests without due process by directing that she be terminated from her position as Monticello Director.

Defendants Brian Allen, Julie Adamic, Yolanda Francisco-Nez, Tom Morgan, Scott Smith, and John Pingree (the "SCSB Defendants") filed a motion for summary judgment (Dkt. No. 85) based on qualified immunity.  Defendant Marlies Burns filed a separate motion for summary judgment (Dkt. No. 86), arguing that she is also entitled to qualified immunity or, in the alternative, Ms. Coleman cannot establish personal involvement by Ms. Burns in the alleged constitutional violations.  For the reasons explained below, the court grants both motions.

## BACKGROUND[1]

Kim Coleman is a co-founder of the Monticello Academy and served for approximately two years as a member of the Board of Directors. In March 2008, the other Monticello Board members (with the exception of Ms. Coleman's husband who recused to avoid a conflict of interest) voted to hire Ms. Coleman as Director of the school.  Ms. Coleman was hired to fill the position from April 1, 2008, to June 30, 2009, with the option for the Board to renew her contract for two additional one-year terms.

In December 2008, the SCSB conducted an investigation of Monticello and Ms. Coleman, based on parent complaints about Ms. Coleman's administration of special education services.  The SCSB provided the results of its investigation in a document dated January 20, 2009, which the parties refer to as the "Preliminary Findings."  (See Preliminary Findings, ECF

---

[1] Much of the factual background of this case is summarized in the court's order of May 25, 2012 (ECF No. 52). The facts below are taken from the evidence produced by the parties in their briefing on the motions for summary judgment and are necessary to further explain this decision.  The court identifies disputes of material fact where they may exist and lays out the facts and all reasonable inferences in the light most favorable to Ms. Coleman as the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

No. 87-27.)  The Preliminary Findings list several alleged problems with Ms. Coleman's

administration of Monticello, including a failure "to authorize and provide appropriate special

education services as mandated by law."  (Id. at MA000074.)  The SCSB also directed the

Monticello Board to take several actions, including "[t]he immediate dismissal of Kim Coleman

as the Director of Monticello Academy and a designated prohibition from Kim Coleman serving

in any leadership or other capacity at the school either paid or volunteer."  (Id. at MA000075.)

     At a January 21, 2009 meeting, Defendant Brian Allen, on behalf of the SCSB, presented

the Preliminary Findings to the Monticello Board and directed the Board to terminate Ms.

Coleman as Director.  (Joel Coleman Dep. 89-91, ECF No. 98-7; Pyle Dep. 20-24, ECF No. 98-

25; Michael Smith Dep. 40-43, ECF No. 98-26.)  The parties dispute the exact details of the

meeting, but multiple Monticello Board members testified that Mr. Allen also threatened to

remove all Board members and shut down the school if Ms. Coleman was not terminated.

Although there may be a factual dispute about whether Mr. Allen did in fact threaten the

Monticello Board, it is undisputed that the Board responded to the Preliminary Findings by

requesting an opportunity to conduct its own investigation.  The Board placed Ms. Coleman on

paid administrative leave while it proceeded with the investigation.

     On January 29, 2009, the Salt Lake Tribune published an article about Ms. Coleman's

leave.  The first line of the article read that "[s]tate education officials ordered the Monticello

Academy Director be placed on paid administrative leave pending an investigation into

allegations of financial mismanagement at the West Valley City charter school."  (Salt Lake

Tribune Article, ECF No. 98-12.)  The article goes on to quote "state investigators" as saying that

"the presence of Joel Coleman on the board that oversees the employment of his spouse appears

3

to have compromised the board's ability to appropriately assess human-resource issues and the provision of services at the school." (Id.)  Mr. Allen was quoted as saying: "We have a very capable principal and assistant running the school. . . . The board has it well under control. I think they're trying to do the right thing." (Id.)

The Monticello Board completed its investigation and did not find any wrongdoing by Ms. Coleman.  The Board kept Ms. Coleman on paid administrative leave through June 30, 2009. At that time, the Board did not renew Ms. Coleman's contract and she was no longer the Director at Monticello.

On August 13, 2009, the SCSB met to discuss the dispute between Ms. Coleman and the SCSB.  The meeting minutes reflect that the SCSB approved recommendations and findings, including a finding that Ms. Coleman "was directly and unilaterally responsible for intimidating and/or directly instructing at least one Monticello Academy employee to deny special education services to Monticello Academy students." (Meeting Minutes at COLEMAN PRD 001758, ECF No. 87-37.)  These minutes were later made available to the public.

Ms. Coleman filed a complaint in the Third District Court on October 26, 2010, alleging that the SCSB's actions violated her due process rights.  The case was removed to this court on December 2, 2010.  Defendants now move for summary judgment, arguing that Ms. Coleman's remaining claims must be dismissed because Defendants are entitled to qualified immunity and because Ms. Coleman failed to produce sufficient evidence to support her claims.

## ANALYSIS

With Defendants' assertion of qualified immunity, Ms. Coleman must "meet a strict two-part test by showing (1) that the defendant violated a constitutional or statutory right, and (2) that

this right was clearly established at the time of the defendant's conduct." Bowling v. Rector, 584 F.3d 956, 964 (10th Cir. 2009) (quotations omitted).  Ms. Coleman identifies two separate constitutional rights that Defendants allegedly violated.  First, Ms. Coleman asserts that Defendants unconstitutionally deprived her of a protected property interest by terminating her employment without due process.  Second, Ms. Coleman claims that Defendants violated her liberty interest by making defamatory statements that resulted in lost job opportunities and damage to her professional reputation.

## I.      Property Interest

To determine whether a plaintiff's property rights have been denied without due process, the court "engage[s] in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998).  Under this test, a property interest claim "depends on [Ms. Coleman] having had a property right in continued employment." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 539 (1985).

Generally, "[a]t-will employees lack a property interest in continued employment." Darr v. Town of Telluride, Colo., 495 F.3d 1243, 1252 (10th Cir. 2007).  And under Utah law, there is "a presumption that an employment relationship which has no specified term of duration is an at-will relationship." Fox v. MCI Commc'ns Corp., 931 P.2d 857, 859 (Utah 1997) (quotations omitted).  But an employee may rebut the at-will presumption and "may possess a property interest in public employment if she has tenure, a contract for a fixed term, an implied promise of continued employment, or if state law allows dismissal only for cause or its equivalent." Darr, 495 at 1251.  An employee may also rebut the presumption by proving that "a statute or

5

regulation restricts the right of an employer to terminate an employee under certain conditions."

Fox, 931 P.2d at 859.

Ms. Coleman signed an employment contract on April 28, 2008, that explicitly created an

at-will relationship.  Paragraph 2 of Ms. Coleman's contract reads:

> Employee recognizes that he or she is an at-will employee, meaning that his or her employment can be terminated by Employer, with or without cause or notice, at any time.  No promise of employment for a definite duration is given by this agreement or by any other material received by Employee from Employer . . . . This agreement in no way modifies the at-will nature of Employee's employment.  In the event of any contrary provisions contained in other materials received by Employee and this Agreement relative to the at-will employment status, this Agreement will control and supersede such other material.

(Employment Agreement, ECF No. 87-18.)  The contract further directs that any previous

understandings or representations are merged into the final, written agreement.

Although she signed this agreement, Ms. Coleman contends that she had an implied

contract that overrides the at-will terms of her written contract.  Ms. Coleman argues that she and

the Monticello Board all understood that she was being hired as Director to perform specific

projects—namely, she was chosen to hire a new principal and manage the formation of the high

school at Monticello.  Ms. Coleman cites testimony from Wayne Pyle, Michael Smith, and her

husband, Joel Coleman, all of whom were members of the Monticello Board.  These men

testified that they understood that Ms. Coleman was being hired to complete the above projects

and they believed that Ms. Coleman would serve as Director until the high school at Monticello

was complete.  (Pyle Dep. 64-65, ECF No. 98-25; Joel Coleman Dep. 119-20, ECF No. 98-7.)

This evidence is not sufficient to establish Ms. Coleman's alleged property interest. To

rebut the at-will presumption, particularly in light of the explicit at-will relationship created by

the employment contract, Ms. Coleman must prove that her employer (the Monticello Board) communicated "a manifestation of intent to the employee that is sufficiently definite to constitute a contract provision." Tomlinson v. NCR Corp., 2014 UT 55, ¶ 13, 345 P.3d 523.  None of the above testimony provides a sufficiently clear manifestation of intent to modify Ms. Coleman's at-will status. The testimony merely shows that Ms. Coleman and the Monticello Board members believed Ms. Coleman was hired for the specific purpose of selecting a principal and finishing the high school and that she would complete those tasks.  But a belief that Ms. Coleman would work on certain projects does not mean that her employment was guaranteed for a specific time.

Ms. Coleman relies on Kingsford v. Salt Lake City School District, 247 F.3d 1123 (10th Cir. 2001), to argue that the court should consider the parties' subjective understanding to decide whether an implied contract exists to overcome the at-will presumption.  In Kingsford, the plaintiff was a high school football coach who claimed that, even though he did not have a written contract for a specific term, he should have been treated as a teacher with the benefit of the teachers' contract, which required "just cause" before termination.  The plaintiff also testified that he subjectively believed he could only be terminated for improper treatment of players or based on his win-loss record.  In addition, district personnel testified that coaches could only be fired based on some "logical rationale" or "reasonable justification;" coaches could not be terminated for an "arbitrary or capricious" reason.  Id. at 1132.  The court concluded that the evidence "taken in the aggregate, suggest[ed] that there may have been a policy . . . that coaches would only be terminated for cause."  Id.  Although there was also evidence that coaches served at the principal's discretion, the conflicting evidence created a factual dispute on the question of whether there was an implied promise that overcame the at-will presumption.

In this case, there is no evidence that suggests Ms. Coleman could only be terminated for cause. There is no evidence that Ms. Coleman was guaranteed a job until the high school was complete. There is no evidence of a promise that her contract would be renewed or that anyone made other contractual promises that would change her at-will status. And there is no evidence that Ms. Coleman or any other witness understood that she could only be terminated for specific reasons. Indeed, the Monticello witnesses confirmed that the Board had discretion to terminate Ms. Coleman at any time, with or without cause. (Pyle Dep. 18; Joel Coleman Dep. 80; Michael Smith Dep. 20-21, 38-39, ECF No. 98-26.) Even viewing the evidence and drawing all reasonable inferences in Ms. Coleman's favor, the court concludes that Ms. Coleman was an at-will employee. And as an at-will employee, Ms. Coleman did not have a protected property interest in her ongoing employment at Monticello.

As an alternative to her implied contract theory, Ms. Coleman asserts that the Utah Charter Schools Act, Utah Code Ann. § 53A-1a-509, provides the necessary property interest. "[A] state statute or regulation can create a protected property interest in a particular employment status or rank." Rippstein v. Sevier Cty., Civil No. 2:06-CV-1063 BSJ, 2009 WL 1872595, at *3 (D. Utah June 29, 2009). But "[p]rocedural detail in a statute or regulation, standing alone, is not sufficient to establish a protected property interest in an employment benefit." Hennigh, 155 F.3d at 1254. "[I]f the statute or regulation places substantive restrictions on the discretion to demote an employee, such as providing that discipline may only be imposed for cause, then a property interest is created." Id.; see also Asbill v. Housing Auth. of Choctaw Nation of Okl., 726 F.2d 1499, 1502 (10th Cir. 1984) ("[P]rocedural protections alone do not create a protected

property right in future employment; such a right attaches only when there are substantive restrictions on the employer's discretion.").

The Utah Charter Schools Act directs that if a charter school is out of compliance with the Act or the school's charter, the SCSB must notify the governing board of the school "that the charter school has a reasonable time to remedy the deficiency."  Utah Code Ann. § 53A-1a-509(1).  If the charter school does not remedy the deficiency, the SCSB is to take one or more of the actions listed in the statute, including removal of the school's director.  Id. § 53A-1a-509(2).

Ms. Coleman maintains that the Act required the SCSB to provide the process defined in the statute before removing her as Monticello Director.  The court agrees that, under the Act, the SCSB must follow certain procedural requirements: the SCSB must notify the governing board of a charter school of any incidents of noncompliance and give a charter school "a reasonable time" to remedy alleged deficiencies before removing the school's director or taking other corrective action.  But these requirements are procedural. Nothing in the Act substantively restricts the SCSB's discretion to remove a charter school director.  And nothing in the Act changes Ms. Coleman's at-will status. Moreover, the procedural protections in the Act benefit the school itself, not school employees.  There is no requirement that notice or other process be given to a school director before SCSB removal.

## II.    Liberty Interest

To prevail on her liberty interest claim, Ms. Coleman must satisfy a four-part test:

First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published.

9

>These elements are not disjunctive, all must be satisfied to demonstrate deprivation
>of the liberty interest.

Workman v. Jordan, 32 F.3d 475, 481 (10th Cir. 1994) (citations omitted).

Although the parties analyzed other potential statements that Ms. Coleman previously alleged, Ms. Coleman's counsel confirmed at the summary judgment hearing that her liberty interest claim is based solely on the following: (1) the January 20, 2009 Preliminary Findings written by the SCSB; (2) an article in the Salt Lake Tribune; and (3) the minutes of the August 13, 2009 SCSB meeting. Each of these statements fails to satisfy at least one element of the Workman test.

First, there is no evidence that the Preliminary Findings were published. Although Ms. Coleman testified at her deposition that the Preliminary Findings were posted on the SCSB website and distributed to newspapers, there is no evidence to support this assertion. And conclusory statements, without evidence, are insufficient to survive summary judgment. Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995). Ms. Coleman has not introduced evidence of online postings or of publications in any newspaper. And the only article cited by Ms. Coleman is the January 29, 2009 Salt Lake Tribune article, which does not quote from or otherwise refer to the Preliminary Findings. The record only shows that the Preliminary Findings were circulated by email among SCSB members and were read to the Monticello Board at a closed meeting on January 21, 2009. The minutes of that meeting were not made public. The specific statements made in the Preliminary Findings were only shared in private government meetings. Such "intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication . . . ." Asbill, 726 F.2d at 1503.

Ms. Coleman also alleges that one or more of the Defendants made defamatory comments that were published in a January 29, 2009 Salt Lake Tribune article published with the headline "State orders probe of charter school's finances."  (Salt Lake Tribune Article, ECF No. 98-12.)  The article contains three relevant statements.  First, Brian Allen is quoted at the end of the article, but his statement does not impugn Ms. Coleman's good name or reputation.  He merely stated that Monticello was being run by "a very capable principal and assistant" and that the Monticello Board had the situation "under control" and was "trying to do the right thing."  (Id.)  These statements are not disparaging or stigmatizing in any way.

For the other statements in the article, no speaker is identified.  The article contains a quote from unidentified "state investigators" who said that Joel Coleman's presence on the Monticello Board may have "compromised the board's ability to appropriately assess human-resource issues and the provision of services at the school."  (Id.)  Without identification of the speaker, the statement cannot be used to impose liability on any of the defendants.

Ms. Coleman also relies on the first line of the article, which states that "[s]tate education officials ordered the Monticello Academy Director be placed on paid administrative leave pending an investigation into allegations of financial mismanagement at the West Valley City charter school."  (Id.)  Ms. Coleman initially claimed that Mr. Allen provided this information to the newspaper, but Mr. Allen denied making the statement and there is no evidence that he was the source.  Ms. Coleman now argues that, if Mr. Allen did not make the statement, it must have been Ms. Burns.  But Ms. Coleman's conclusion is based on pure speculation.  Even viewing the evidence and drawing inferences in Ms. Coleman's favor, she has not identified any evidence to support the conclusion that Ms. Burns spoke to or gave any information to the article's author.  In

sum, the statements in the article either are not defamatory or cannot be attributed to a specific defendant.  As a result, the article cannot be used as the basis for a liberty interest claim.

Finally, Ms. Coleman relies on a statement in the minutes of the August 13, 2009 SCSB meeting.  Defendants maintain that Ms. Coleman ceased to be the Monticello Director when her contract was not renewed on June 30, 2009, and because the August 13, 2009 meeting was about two months later, any statements in the minutes could not have been made in the course of Ms. Coleman's termination.

The Tenth Circuit has explained that "publication of defamatory statements need not be strictly contemporaneous with a termination to occur in the course of the termination of employment." Renaud v. Wyo. Dep't of Family Servs., 203 F.3d 723, 727, (10th Cir. 2000). Rather, "[a] roughly contemporaneous statement made incident to the termination that concerns the manner or reasons for the employee's termination may qualify as one made in the course of termination of employment." Bjorklund v. Miller, 467 F. App'x 758, 768 (10th Cir. 2012) (quotations and alterations omitted).  In addition to proving that the statement was made in the course of termination, Ms. Coleman must also prove that the minutes foreclosed other job opportunities.  In Workman, the Tenth Circuit said that a statement underlying a liberty interest claim "must occur in the course of terminating the employee or must foreclose other employment opportunities." 32 F.3d at 481 (emphasis added).  Although it stated this element disjunctively, the Tenth Circuit has since held that a plaintiff must prove that the relevant statement occurred in the course of termination and that it foreclosed other employment opportunities.  See, e.g., Guttman v. Khalsa, 669 F.3d 1101, 1126 (10th Cir. 2012); Renaud v. Wyo. Dep't of Family Servs., 203 F.3d 723, 727, 728 n.1 (10th Cir. 2000).

12

The August 13, 2009 meeting minutes reflect the SCSB's finding that Ms. Coleman "was directly and unilaterally responsible for intimidating and/or directly instructing at least one Monticello Academy employee to deny special education services to Monticello Academy students."  (Meeting Minutes, Aug. 13, 2009, at COLEMAN PRD 001758, ECF No. 87-37.) This statement was included in minutes of a meeting where the SCSB was discussing Ms. Coleman's termination.  And the statement deals with the very reasons for the SCSB's decision to direct Ms. Coleman's removal as Monticello Director.  Because the statement was made incident to and concerned the reasons for Ms. Coleman's removal, a jury could conclude that the statements were made in the course of Ms. Coleman's termination.

But Ms. Coleman has not provided any evidence of specific job opportunities that she lost as a result of the statement in the August 13, 2009 minutes.  Although Ms. Coleman alleges generally that her professional reputation was damaged by Defendants' conduct, she has not described any position that she applied for or how her ability to obtain a specific job was affected by Defendants' statement.  At oral argument, Ms. Coleman's counsel argued that Defendants foreclosed Ms. Coleman's opportunity to work as Director at Monticello.  Ms. Coleman may not use the loss of her job as Director as the basis for her liberty interest claim; she must identify and prove that Defendants' statements "foreclosed other job opportunities."  Workman, 32 F.3d at 481 (emphasis added).

In the absence of evidence of lost job opportunities resulting from the August 13, 2009 meeting minutes, and with insufficient evidence to support liability for Defendants' other statements, Ms. Coleman cannot prevail on her liberty interest claim. As a result, the court grants summary judgment in Defendants' favor.

**CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment and Supporting

Memorandum of Defendants Brian Allen, Julie Adamic, Yolanda Francisco-Nez, Tom Morgna,

Scott Smith, and John Pingree (ECF No. 85) is GRANTED.  Marlies Burns' Motion for

Summary Judgment (ECF No. 86) is also GRANTED.

DATED this 20th day of August, 2015.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge